[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
[1] Although no actual "cross-appeal" has been filed in this appeal, for ease of discussion we refer to Michael Montgomery as the cross-appellant. Both Cathy Montgomery (Case No. 03CA2923) and Michael Montgomery (Case NO. 03CA2925) filed notices of appeal from the trial court's judgment and these cases have been consolidated for review.
 DECISION AND JUDGMENT ENTRY
{¶ 1} This is a consolidated appeal from a Scioto County Common Pleas Court, Domestic Relations Division, judgment. The court found Cathy Montgomery n/k/a Cathy Tackett, plaintiff below and appellant herein, and her ex-husband, Michael Montgomery, defendant below and cross-appellant herein, in contempt of court and ordered each of them to serve sixty days in jail. Although both parties were previously provided with an opportunity to purge their contempt, the court ordered them to serve thirty day jail sentences for contempt citations that they did not purge. Appellant assigns the following errors for review:
First Assignment of Error:
"The Lower Court abused its discretion by failing to rule upon appellant's motion for supervised visitation filed October 16, 2001, and by failing to honor the terms of the agreed judgment entry filed November 18, 2002."
Second Assignment of Error:
"The Lower Court abused its discretion by finding appellant in contempt."
Third Assignment of Error:
"The Lower Court abused its discretion by imposing a jail sentence on appellant for contempt."
Fourth Assignment of Error:
"The Lower Court abused its discretion by imposing the sentence for contempt which had been purged."
 {¶ 2} Cross-appellant posits his own cross-assignments of error as follows:
First Cross-Assignment of Error:
"The Trial Court abused its discretion by imposing a jail sentence for contempt when defendant had demonstrated the impossibility of his full compliance with the court's purge terms."
Second Cross-Assignment of Error:
"The Trial Court erred in finding defendant montgomery in contempt by ignoring the uncontroverted evidence of defendant's inability to pay child support."
 {¶ 3} The parties married on June 20, 1992, and are the parents of two children: Brittany Nichole Weekly (born prior to marriage on 9-22-89) and Kelsie Michael Montgomery (born as issue of their marriage on 6-11-93). On April 1, 1996, the parties divorced. The trial court designated appellant as the residential parent for the minor children and ordered the cross-appellant to pay child support.
 {¶ 4} While the initial divorce proceedings apparently went smoothly, since that time both parties have waged an acrimonious eight year battle that eventually prompted an exasperated magistrate to characterize their relationship as "incredibly stupid" and to note that they "thrive on . . . inane conflict and all-consuming enmity."[3] Such enmity manifested itself not only in appellant frustrating her ex-husband's visitation rights with the children, and cross-appellant's failure to pay child support, but also in prolific motion practice by each party — mostly seeking to hold the other in contempt of court for alleged transgressions of prior court orders.
 {¶ 5} Six such motions came on for consideration in 1997 at which time the court found (1) appellant in contempt denying her ex-husband visitation rights;[4] and (2) cross-appellant in contempt for his failure to pay child support and medical bills. The trial court sentenced each party to thirty days in jail, but provided them the opportunity to purge the contempt by faithful compliance with all court orders.
 {¶ 6} Unfortunately, the parties apparently paid little heed to the trial court's directive. In 2001-2002, cross-appellant filed no fewer than five contempt motions against his ex-wife for interfering with his visitation rights. His motions can be summarized as follows:
Date Gist of Motion
 Cross-appellant had not seen Brittany since 9-2001
 Appellant kicked Brittany out of the home
 Cross-appellant still has no contact with Brittany
 Appellant failed to cause children to participate in supervised visits or pay for evaluations
 Appellant failed to cause children to participate in visitation
 {¶ 7} Appellant also filed a motion to hold her ex-husband in contempt of court for failing to pay child support. She also requested a $12,569.30 lump sum judgment for support arrearages.
 {¶ 8} These motions all came on for hearing over several days in April and June of 2003. There was no question that appellant had been deprived of visitation with his children — (particularly Brittany)[5] — or that he had not paid court ordered child support.[6] Various excuses were offered for these problems. Appellant testified that some visitations were missed for medical reasons or so the children could participate in activities at the fair. The evidence was also uncontroverted that Brittany refused to visit with her father and, on occasion, caused such a ruckus when she did visit him that she was asked to leave the visitation center. For his part, cross-appellant testified that he injured his back and no longer was employed. Thus, he argued, he could not satisfy his child support obligation. He conceded, however, that he did not seek any redetermination of that obligation.
 {¶ 9} On November 17, 2003, the trial court granted three of cross-appellant's five contempt motions as well as appellant's contempt motion. The court sentenced both parties to sixty days in the county jail, but gave them an opportunity to purge that contempt through future compliance with the court's orders. By finding each of them in contempt on this occasion, however, the court concluded they had not purged their previous contempt citations from 1997. Consequently, the court ordered each party to serve the thirty day jail sentence. These appeals followed.[7]
 I {¶ 10} Because each side is appealing their contempt citation and imposition of jail time, it is useful to begin our analysis with a brief review of the law of contempt before we turn to the merits of the assignments of error and the cross-assignments of error.
 {¶ 11} "Contempt of court" is defined as the disobedience or disregard of a court order or a command of judicial authority.Daniels v. Adkins (June 3, 1994), Ross App. No. 93CA1988;Johnson v. Morris (Dec. 19, 1993), Ross App. No. 93CA1969. It involves conduct which engenders disrespect for the administration of justice or which tends to embarrass, impede or disturb a court in the performance of its function. Denovchek v.Trumbull Cty. Bd. of Commrs. (1988), 36 Ohio St.3d 14,15,520 N.E.2d 1362; Windham Bank v. Tomaszczyk (1971),27 Ohio St.2d 55,271 N.E.2d 815, at paragraph one of the syllabus. Proceedings in contempt are intended to uphold and ensure the effective administration of justice, secure the dignity of the court and affirm the supremacy of law. Cramer v. Petrie (1994),70 Ohio St.3d 131, 133, 637 N.E.2d 882. The power of the common pleas courts to punish contemptuous conduct derives from its inherent authority, Burt v. Dodge (1992), 65 Ohio St.3d 34, 35,599 N.E.2d 693; Zakany v. Zakany (1984), 9 Ohio St.3d 192,459 N.E.2d 870, syllabus, as well as statute. See e.g. R.C. 2705.01
and 2705.02.
 {¶ 12} A distinction exists between criminal and civil contempt. Criminal contempt proceedings vindicate the legal system's authority and punishes the offending party. Scherer v.Scherer (1991), 72 Ohio App.3d 211, 214, 594 N.E.2d 150; In reSkinner (Mar. 22, 1994), Adams App. No. 93CA547. The sanction imposed for criminal contempt operates as a punishment for the completed act of disobedience. Brown v. Executive 200, Inc.
(1980), 64 Ohio St.2d 250, 254, 416 N.E.2d 610. ConTex, Inc. v.Consol. Technologies, Inc. (1988), 40 Ohio App.3d 94, 95,531 N.E.2d 1353; Schrader v. Huff (1983), 8 Ohio App.3d 111, 112,456 N.E.2d 587.
 {¶ 13} By contrast, civil contempt exists when a party fails to do something ordered by the court for the benefit of an opposing party. Pedone v. Pedone (1983), 11 Ohio App.3d 164,165, 463 N.E.2d 656; Beach v. Beach (1955), 99 Ohio App. 428,431, 134 N.E.2d 162. The punishment is remedial, or coercive, in civil contempt. State ex rel. Henneke v. Davis (1993),66 Ohio St.3d 119, 120, 609 N.E.2d 544. In other words, it is meant to enforce compliance with the court's orders. Interference with visitation is typically punished by civil contempt, Caldwell,
supra at ¶ 8; Mascorro v. Mascorro (Jun. 9, 2000), Montgomery App. No. 17945, as is failure to pay child support, Dressler v.Dressler, Warren App. Nos. CA2002-08-085 CA2002-11-128, 2003-Ohio-5115 at ¶ 14; Stuber v. Stuber, Allen App. No. 1-02-65, 2003-Ohio-1795 at ¶ 19, because the aim of the contempt citation in either situation is to compel the offending parent to cooperate with visitation or to make the required support payments.
 {¶ 14} A finding of civil contempt must be supported by clear and convincing evidence. See Brown v. Executive 200, Inc.
(1980), 64 Ohio St.2d 250, 253, 416 N.E.2d 610; also see Carrollv. Detty (1996), 113 Ohio App.3d 708, 711, 681 N.E.2d 1383;ConTex, Inc. v. Consolidated Technologies, Inc. (1988),40 Ohio App.3d 94, 96, 531 N.E.2d 1353. Moreover, the decision to hold a person in contempt lies within trial court's sound discretion.State ex rel. Ventrone v. Birkel (1981) 65 Ohio St.2d 10, 11,417 N.E.2d 1249, and appellate courts will not reverse that decision unless an abuse of that discretion is established.Carroll, supra at 711; In re C.M., Summit App. No. 21720, 2004-Ohio-1984 at ¶ 10; In re Howard, Butler App. Nos. CA2001-11-264, CA2001-12-281 CA2001-12-282, 2002-Ohio-5451 at ¶ 11.
 {¶ 15} An abuse of discretion means more than just an error of law or judgment; it implies that the trial court's attitude was unreasonable, {tc\l1 "unreasonable,} arbitrary or unconscionable. Landis v. Grange Mut. Ins. Co. (1998),82 Ohio St.3d 339, 342, 695 N.E.2d 1140; Malone v. Courtyard by MarriottL.P. (1996), 74 Ohio St.3d 440, 448, 659 N.E.2d 1242; State exrel. Solomon v. Police Firemen's Disability Pension Fund Bd.of Trustees (1995), 72 Ohio St.3d 62, 64, 647 N.E.2d 486. In reviewing for an abuse of discretion, appellate courts are not free to simply substitute their judgment for that of the trial court. See State ex rel. Duncan v. Chippewa Twp. Trustees
(1995), 73 Ohio St.3d 728, 732, 654 N.E.2d 1254; In re Jane Doe1 (1991). 57 Ohio St.3d 135, 137-138, 566 N.E.2d 1181; Berk v.Matthews (1990), 53 Ohio St.3d 161, 169, 559 N.E.2d 1301. Indeed, to establish an abuse of discretion, the result must be so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias. Nakoff v.Fairview Gen. Hosp. (1996), 75 Ohio St.3d 254, 256,662 N.E.2d 1; also see Bragg v. Hatfield, Vinton App. No. 02CA567, 2003-Ohio-1441, ¶ 22.
 {¶ 16} With these principles in mind, we turn our attention to the merits of the assignments of error and the cross-assignments of error.
 II {¶ 17} Appellant advances two arguments in her first assignment of error. First, she asserts that the trial court abused its discretion by not ruling on a 2001 motion for supervised visitation. We are not persuaded.[8]
 {¶ 18} First, we note that it is well-settled law that a motion not expressly ruled on is deemed impliedly overruled. SeeTakacs v. Baldwin (1995), 106 Ohio App.3d 196, 209,665 N.E.2d 736; Kline v. Morgan (Jan. 3, 2001), Scioto App. Nos. 00CA2702 00CA2712; State v. Hall (Feb. 17, 1993), Gallia App. No. 92CA2 3. Thus, we conclude that any inaction by the trial court on appellant's motion constitutes a denial of that motion. Appellant, however, does not argue that the trial court erred by overruling her motion. Accordingly, we do not address that issue.
 {¶ 19} Moreover, even if the trial court did impliedly overrule her motion, the record reveals that for some time, cross-appellant's visits with his children were supervised through the "Family Time" program at Shawnee State University.[9] We therefore discern no prejudice, let alone reversible error, on the trial court's part in this regard.
 {¶ 20} Appellant's second argument goes to a paragraph in a 2002 agreed Judgment Entry which provides that both parties abide by Jan Oliver's supervised parenting recommendations. During trial court proceedings, Oliver testified that Kelsie should continue supervised visitations with her father, but that Brittany should not be required to visit him. Because Brittany's failure to visit her father happens to coincide with Oliver's recommendations, appellant takes the position that she cannot be held in contempt under the terms of the 2002 agreed Judgment Entry. We disagree with appellant.
 {¶ 21} The flaw in appellant's argument is that the 2002 agreed Judgment Entry was not self-executing. If visitation was to be curtailed pursuant to Oliver's recommendations, the parties should have obtained a revised or new court order to that effect. The trial court possesses the final word on the terms and conditions of visitation and neither the parties nor a counselor are free to simply interject their own recommendations or interpretations of a previous order. Appellant was obligated to comply with the previous visitation order until such time as the trial court ordered her to do otherwise.
 {¶ 22} For these reasons, we find no merit in the first assignment of error and it is accordingly overruled.
 II {¶ 23} We jointly consider appellant's second and third assignments of error which argue that the trial court erred in finding her in contempt of the visitation order and in sentencing her to jail as punishment for that contempt.
 {¶ 24} The 1996 divorce decree provides that crossappellant is entitled to companionship with the children as provided for in Scioto County Local Rule XX.[10] Appellant was directed to "unfailingly adhere" to that rule in 1997 when she was found in contempt and, apparently, that rule remains the standing order for visitation notwithstanding that the visits are now supervised.
 {¶ 25} The evidence adduced below reveals that appellant failed to produce the children for several scheduled visitations. While she had excuses for those failures, ranging from medical excuses[11] to the children's participation at the county fair, the decision of how much weight to give those excuses rested with the trial court as the trier of fact. In other words, the trial court is in a much better position than this court to view the appellant and observe her demeanor, gestures, and voice inflections and factor those observations into weighing her credibility. See Myers v. Garson (1993), 66 Ohio St.3d 610,615, 614 N.E.2d 742; Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 80, 461 N.E.2d 1273. The court, acting as the trier of fact, was free to believe all, part or none of appellant's testimony. Rogers v. Hill (1998),124 Ohio App.3d 468,470,706 N.E.2d 438;Stewart v. B.F. Goodrich Co. (1993), 89 Ohio App.3d 35,42,623 N.E.2d 591. Obviously, the trial court afforded little credibility to appellant's excuses for failing to comply with the visitation order and, in light of the evidence adduced below and appellant's previous history of impeding visitation, we find no error in that determination.
 {¶ 26} Also, considerable evidence indicates that Brittany refused to visit with her father and, on occasion, caused such a ruckus at the visitation center that she had to be removed. The trial court found that appellant did not do enough to compel Brittany to visit with her father. We find no error in that determination.
 {¶ 27} Many Ohio courts have held that until a minor is of a sufficient age to independently decide whether to visit a parent, a custodial parent must compel visitation. See Caldwell v.Caldwell, Gallia App. No. 02CA17, 2003-Ohio-1752 at ¶ 23;Newhouse v. Toler (Nov. 20, 1997), Cuyahoga App. No. 71834;Smith v. Smith (Jan. 27, 1988), Pike App. No. 397.[12]
Although appellant denied that she discouraged visitation between Brittany and her father, we find nothing in the record to suggest that she attempted to compel visitation. Indeed, when asked by the trial court how they handled Brittany's refusal to visit her father, Anthony Tackett (the girl's stepfather) stated that he and his wife would simply talk to her.[13] This provides a sufficient basis for the court to determine that appellant did not comply with the order to compel visitation between Brittany and her father.
 {¶ 28} Our ruling on this issue is buttressed by another factor as well. There is no question that the minor children hold a deep seated animosity toward their father. Brittany has refused to attend supervised visitation for months and Kelsie told the trial court judge (during an in camera interview) that she "hated" her father. It is disturbing that the children hold these views. It is also very disturbing as to how those views may have developed.
 {¶ 29} Appellant testified that she had never done anything to turn the children against their father. That said, a multitude of evidence appears in the record to belie her claim. As far back as 1997, the Magistrate noted that appellant impeded visitation and appeared to do so out of an "all-consuming enmity" (which consumed her ex-husband as well). The guardian ad litem also paints a grim picture of how the children have been affected by their parents' antipathy towards each other:
"It is also apparent that the parties' actions the past seven years in regard to the children have substantially contributed to the situation today. The children have been exposed to attemptsby both parents to alienate the children from the other. Theeffects of this behavior are externalized by Brittany's actions,and if such continues, Kelsie will continue to be affected to agreater extent as well.
If the parties do not find some way to rise above the antagonistic position that they have remained in since their separation, and mend their differences in regard to the children, then they will continue to incur legal expenses, and more seriously, the children will continue to be harmed by their actions. Further, if things do not change, the children most likely will continue to have trouble in school and with their behavior. * * *
* * The allegations of danger that exist at [their father's] residence are unfounded. Although cognizant of Brittany's condition,[14] she is in no further danger at her father's than at school or other places." (Emphasis added.)
 {¶ 30} We further note that appellant testified with considerable bitterness about her marriage to cross-appellant. Although they had been divorced for several years, she vividly recalled everything her ex-husband had "done to [her] in the past."[15] She denied conveying such bitterness to her children. However, Oliver opined that "undue influence" from their mother might be a "secondary factor" in the strained relationship crossappellant has with his daughters.
 {¶ 31} Finally, the transcript of the in camera interview contains interesting exchanges. Ten year old Kelsie told the judge that she did not want to visit her father at his home because it was unsafe. When the trial court replied that the guardian ad litem had been there and had found no problems, Kelsie explained that this was "because he has never had asurprise visit." (Emphasis added.) Kelsie also told the judge that she and her sister wanted to be adopted by her stepfather. When asked by the judge if anyone had brought up that idea to her, Kelsie responded that she was "the one who thought of it" and that, in any event, she did not want any visits with her father "to be unsupervised." (Emphasis added.)
 {¶ 32} During her interview with the trial court, thirteen year old Brittany also reiterated that she didn't want to see her father. In fact, she volunteered at one point that she had been getting "good grades now that I haven't been seeing him[.]" When asked about visitation at her father's home, Brittany responded that it was "unsafe to be out there." She explained "you could get killed just walking around there just because they're very, very, very violent people." When informed that the guardian ad litem found nothing potentially harmful at her father's residence, Brittany answered to the effect that she had "no idea what they did to change everything."
 {¶ 33} The children did not state that they were "coached" in what to tell the trial court and there is no direct evidence that this is what occurred. Nevertheless, the children's thoughts and language appear to be very advanced for their ages. That ten year old Kelsie would know that such a thing as a "surprise" visit by a guardian ad litem even exists seems extraordinary, as does the fact that Brittany would simply blurt out that her grades had improved since she stopped visitations with her father. Also, Brittany, for example, told the court that she wanted her stepfather to adopt her because he pays her medical bills. It is unlikely that a thirteen year old child is aware of something like that, or considers it to be important, unless she was directly informed of that particular fact.
 {¶ 34} This is not to say that the cross-appellant has not engaged in similar activities. The transcript is replete with references to how he allegedly enticed the girls to tell "lies" about their mother. While such conduct is, if true, reprehensible, and indeed very damaging to the children, it does not support a unilateral decision to ignore a court order to provide visitation.
 {¶ 35} After our review of this ongoing and frustrating dispute, we readily conclude that ample clear and convincing evidence supports the trial court's conclusion that appellant impeded her ex-husband's visitation. We also find no abuse of discretion in holding her in contempt of court for such action and imposing a sixty jail sentence. Appellant has engaged in these tactics for years and, unfortunately, a jail sentence appears to be the only means left to coerce her into complying with the trial court's orders. We again note that the court also gave appellant the opportunity to avoid that sentence, and to purge her contempt, through future compliance with the visitation order.[16]
 {¶ 36} For these reasons, we find no merit in appellant's second and third assignments of error and they are accordingly overruled.
 III {¶ 37} In her final assignment of error, appellant asserts that the trial court erred by ordering her to serve the thirty day jail sentence from her prior 1997 contempt citation. Specifically, she contends that she purged the contempt from that particular citation. We disagree.
 {¶ 38} The 1997 judgment specified that appellant could purge her contempt by "unfailingly adhering" to the rules governing visitation. No time limit was expressed on that directive. Thus, it applied for the duration of the childrens' minority or until subsequent court ordered modifications. As demonstrated by the fact that the trial court sustained three of the five contempt motions filed against her during the period 2001-2002, appellant did not manifest an unfailing adherence to the court's visitation orders. Thus, she did not purge her contempt.
 {¶ 39} Another question is whether a jail sentence imposed seven years ago can be resuscitated if a party exhibits contumacious behavior in the future. While the imposition of such a sentence may be unusual, we find nothing in our own research to prohibit it. Moreover, in extraordinary situations like the case sub judice, we believe that it is a useful tool in forcing parties to comply with visitation orders. As we noted Caldwell,
supra at ¶ 8, it is difficult to fashion a method to purge contempt for violations of a visitation order — there is no way to make up lost visitation. The only conceivable method is to allow the contumacious party to purge by faithful future compliance with visitation orders. As noted at length in this opinion, however, appellant has not complied with those orders. Indeed, the evidence supports the view that she has attempted to circumvent them by influencing the children to avoid visits with their father.
 {¶ 40} In the case at bar, we agree with the trial court that the best method to coerce compliance with the visitation order is to require the imposition of the jail sentence. For these reasons, we find no merit in her fourth assignment of error and it is accordingly overruled.
 IV {¶ 41} We now turn to the first cross-assignment of error wherein cross-appellant asserts that the trial court erred by imposing the jail sentence from his 1997 contempt citation because he purged himself of that contempt. In particular, cross-appellant argues that he paid "an additional $25.00 per month to be applied toward the arrearage in addition to regular support payments" and that he continued to pay that extra amount for four years. We are not persuaded that this action was sufficient to purge the contempt.
 {¶ 42} First, it is not clear from the record how much was owed for support arrearages in 1997 or what amount appellant actually paid.[17] Cross-appellant has not cited us to any evidence in the record to establish that the arrearages were satisfied. To the contrary, at one point cross-appellant stated that he was "not exactly" sure how much he owed in "back arrears." This indicates that the arrearages were not satisfied and that his argument that he purged himself of the 1997 contempt is without merit.
 {¶ 43} Second, and more important, even if the support arrearages were satisfied, the magistrate's decision and the trial court's judgment make no mention of this as the way to purge the contempt. Indeed, the entry specifies that cross-appellant may purge himself of contempt by "faithfully and timely payment of his child support and half of all reasonable medical bills." This provision did not include a specific time period, but continued for the duration of the support obligation. In other words, if cross-appellant wished to purge himself of the contempt citation, then he was required to pay his child support in a timely manner for the remaining period that such support was owed. By his own admission, he did not. Thus, the contempt was not purged. We therefore find no merit in his first cross-assignment of error and it is accordingly overruled.
 V {¶ 44} Cross-appellant argues in his second cross-assignment of error that even if he did not purge himself of the contempt, he demonstrated the defense of "impossibility" by showing that he was injured, lost his job and received workers' compensation benefits. Thus, he concludes, the court abused its discretion both in finding him in contempt of court in light of these circumstances and in ordering him to serve the thirty days in jail for failing to purge the 1997 contempt. We disagree.
 {¶ 45} Cross-appellant is correct that "impossibility" is a defense to contempt. See Olmsted Twp. v. Riolo (1988),49 Ohio App.3d 114, 117, 550 N.E.2d 507; Courtney v. Courtney (1984),16 Ohio App.3d 329, 334, 475 N.E.2d 1284; Byron v. Byron,
Franklin App. No. 03AP-819, 2004-Ohio-2143 at ¶ 12. By the same token, however, the contemnor bears the burden of proving that defense. See Olmstead Twp., supra at 117; In re Purola
(1991), 73 Ohio App.3d 306, 313-314, 596 N.E.2d 1140; Offenbergv. Offenberg, Cuyahoga App. Nos. 78885, 78886, 79425 79426, 2003-Ohio-269 at ¶ 73.
 {¶ 46} Cross-appellant testified during the hearing that he worked for a lawn care company in the spring of 2002, when he "got a herniated disc and a bulging disc in [his] back." He stated that May 14, 2002 was his last day of work and that he did not have any income for several months. Cross-appellant further testified that he eventually began to receive workers' compensation benefits from which his child support was later withheld. If found credible and given the proper weight, this evidence might have been sufficient to establish the defense of impossibility. The trial court, however, apparently afforded it little weight or credibility. We find no error in that decision.
 {¶ 47} To begin, even though there was apparently little or no evidence to contradict cross-appellant's testimony concerning his injury and inability to pay child support, the trial court, acting as the trier of fact, was not ipso facto required to accept it as true simply because it was uncontroverted. GTENorth, Inc. v. Carr (1993), 84 Ohio App.3d 776, 780,618 N.E.2d 249, at fn. 3; State v. Caldwell (1992), 79 Ohio App.3d 667,680, 607 N.E.2d 1096; Simms v. Heskett (Sep. 18, 2000), Athens App. No. 00CA20. As noted earlier, the trier of fact is free to believe all, part or none of any testimony given before it.Rogers, supra at 468; Stewart, supra at 42. In the instant case, the court obviously afforded little weight and credibility to cross-appellant's explanation for not paying child support. We further note that appellant did not offer independent evidence to substantiate his testimony (i.e. no reports by physicians or medical personnel to substantiate his alleged injury, no proof that he was unable to work, no documents from the Bureau of Workers' Compensation) that he was injured and that he just began to receive benefits.
 {¶ 48} We further point out that the appellant did not seek a support obligation modification after the 1997 contempt finding. Just as his ex-wife is not free to ignore visitation orders because the children participated at the county fair, or because a counselor recommended that one of them should not be forced to visit her father against her will, cross-appellant is, likewise, not free to ignore a support order simply because there is a change in his income. Rather, cross-appellant must petition the court for a modification of that obligation. For these reasons, we find no merit in the second cross-assignment of error and it is therefore overruled.
 VI {¶ 49} Before we conclude, we have a final comment concerning the assignments of error and the cross-assignments of error. Both parties have, in essence, argued that the trial court acted arbitrarily, unreasonably and unconscionably in holding them in contempt of court and in ordering that they serve the thirty day jail sentences first imposed on them in 1997. We, however, believe that far from abusing its discretion, the trial court has actually shown remarkable restraint.
 {¶ 50} Since their divorce eight years ago, appellant and cross-appellant have exhibited unrelenting hostility toward each other and have demonstrated a willingness to use their children as pawns in a very troubling and damaging contest. Both parties have flagrantly disregarded court orders. This conflict has, not surprisingly, spilled over to the minor children and consistently impedes the operation of various court directives. While we cannot pretend to fully understand the anger that the parties have generated as a result of their acrimonious union, it is tragic that the ongoing controversies have continued unabated. In 1997, the trial court noted that the parties both engaged in "reprehensible" behavior and "acted more like children" than their daughters. They were instructed to either mend their ways, and comply with court orders, or they would spend thirty days in the county jail. The litany of motions filed in succeeding years sadly demonstrate that the court's advice went unheeded.
 {¶ 51} Appellant continues to frustrate her ex-husband's visitation with the children. Cross-appellant remains inconsistent in his support payments. Enough is enough. The trial court finally lost its patience. Perhaps thirty days in jail is needed for the parties to adequately contemplate and consider the futility of their actions during the previous seven years, and the very damaging effects on their children. At least this short period of incarceration will prompt the parties, if not to act in the best interests of their children, to obey the trial court's orders. Moreover, the parties would do well to remember that the trial court has also imposed a sixty day jail sentence on the current contempt citations and they will undoubtly be required to serve that sentence as well if they do not purge their contempts by obeying the court orders.
 {¶ 52} Accordingly, after having considered all the assignments and cross-assignments of error in the parties' briefs, and after finding merit in none of them, the judgment of the trial court is hereby affirmed.
Judgment affirmed.
 JUDGMENT ENTRY
It is ordered that the judgment be affirmed and that the parties shall equally divide the costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court, Domestic Relations Division, to carry this judgment into execution.
A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Kline, P.J. Harsha, J.: Concur in Judgment Opinion.
[3] After all, "[w]hy be concerned with the best interests of the children," the magistrate asked rhetorically, "when one can frustrate, infuriate and denigrate one's ex-spouse, instead?"
[4] The magistrate found that on some occasions, appellant even demanded money from her ex-husband (which was not to be reported to Child Support Enforcement) "as a [pre]condition of visitation."
[5] David Weber, an employee of Shawnee State University's "Family Time Visitation Center", testified that no visitations occurred from 6-2-02 to 7-12-02 and only one visit between 8-23-02 and 10-4-02. Cross-appellant also testified that he had not seen Brittany at any visitation since August, 2002.
[6] Cross-appellant conceded during the proceedings that he owed approximately $12,000 in child support arrearages.
[7] Both parties filed their own appeal from that entry and, on December 10, 2003, we consolidated the two cases for purposes of briefing, oral argument and decision.
[8] We also parenthetically note that the sheer number of motions each side has filed in this case since the 1996 divorce could cause the trial court to lose count of pending motions.
[9] It appears that at some point that program was terminated due to budget cuts.
[10] We find no copy of Scioto County Local Rule XX in the record and neither party included a copy in their briefs. We do note, however, that "parenting time and custody issues" are dealt with in rule 6 of the Local Rules of Court set out in the Scioto County Common Pleas Court website located at http://www.ci.portsmouth.oh.us/government/common_pleas_court.html.
[11] The medical excuses included incidents of nausea/vomiting as well as a stubbed toe. Appellant testified that she is a registered nurse and made the determination herself that these problems were severe enough to miss visitation, but not severe enough to warrant trips to a doctor.
[12] We note that the child in Caldwell was thirteen years of age. In the case sub judice, Brittany was thirteen years of age during the time frame at issue. She was not of sufficient age to independently legally decide not to visit with her father.
[13] We acknowledge that Janice Oliver, a child and family therapist at Shawnee Mental Health Center, testified that it is neither effective nor appropriate to punish a child for refusing to visit with a parent. While we respect the opinions of mental health professionals, the law does not allow for children at this age to independently make these decisions. One reason for this view is that a child's view of the situation may be tainted by a custodial parent's influence and desire to deprive visitation with the non-custodial parent.
[14] Brittany's "condition" is hydrocephalus which leaves her in a delicate physical state.
[15] Appellant testified that cross-appellant made her quit school, quit her job, forego college and forbid her from having any contact with her friends or family.
[16] This includes compelling Brittany to attend the visits with cross-appellant and refraining from any conduct or comments that poison the relationship between the children and their father.
[17] Neither the magistrate's decision, nor the trial court's judgment, reduced those arrearages to a lump sum judgment. Moreover, the motion for contempt (filed by the Scioto County Child Support Enforcement Agency) did not allege a specific amount for which cross-appellant was allegedly in arrears. This makes it difficult to calculate whether a $25 extra per month would satisfy the arrearage.